# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| RICHARD KROPP | : | CIVIL ACTION |
| --- | --- | --- |
| v. | : | |
| THE COOPER HEALTH SYSTEM, d/b/a Cooper University Healthcare/Hospital | : | NO. 19-9265 |

## MEMORANDUM OPINION

**Savage, J.**                                                                              June 30, 2021

In this action for reverse gender discrimination and retaliation, defendant Cooper Health Systems moves for summary judgment. Cooper contends the undisputed facts demonstrate that plaintiff Richard Kropp was terminated for poor performance. In response, Kropp argues that his performance was no different than that of his two female colleagues and they were not terminated, proving that Cooper's proffered justification for terminating him was pretextual and that his complaining about gender discrimination and his gender were the basis for his termination.

We conclude that the undisputed facts show that Kropp was terminated for poor performance, not because of his gender or complaints about gender discrimination. His own evidence, including his surreptitiously recorded evaluation meeting with his supervisor, undermines his claim of disparate treatment. The objective data shows that his performance failed to meet Cooper's standard and his two colleagues did meet the standard. Thus, because the undisputed evidence establishes that no rational jury could find that he was terminated for any reason other than his failure to satisfy Cooper's performance standards, we shall grant Cooper's motion for summary judgment.

**Background**

Richard Kropp joined Cooper Health in its Health Information Management (HIM) Department in October 2014 as a Discharged Not Final Billed (DNFB) assistant.[1] In that position, he reviewed patients' medical charts to ensure they were properly completed before they were given to coders.[2] Coders then input patient health information from the medical charts into the computer system for billing purposes.[3]

In June 2016, Kropp was made a coder in-patient associate,[4] a new position created to train new coders in anticipation of becoming Coder IIs after a year.[5] Four female employees, Charlotte "Judy" White, Ashley White, Ashley Price, and Niketa Chotalal, were also promoted to the same position around the same time.[6] Kropp was the only male coder in the HIM department.[7]

A coder's work is reviewed by a Coding Quality Specialist (CQS). CQSs train new coders, review their work, provide them with feedback, distribute charts, and generate

---

[1] *See* Def.'s Mot. for Summ. J. Ex. 1 at 20:1-21:5 (Kropp Deposition Transcript) (ECF No. 37-3).

[2] *Id.* at 24:22-25:14.

[3] *See* Def.'s Mot. for Summ. J. Ex. 3 at 37:4-8 (Fabian Deposition Transcript) (ECF No. 37-4) (Q: "What are the job responsibilities of the coders?" A: "To code." Q: "Anything else?" A: "To code accurately and productively . . .")

[4] Kropp Dep. Tr. at 27:21-23.

[5] *Id*. at 28:2-12; Fabian Dep. Tr. at 120:24-121:11 (Q: "Do you know when the decision was made as to whether or not these five individuals were going to be placed into the coder II position track?" A: "That was – again, that was part of the program that eventually – it should have been done a year after their hire date, but it somehow got lost in the shuffle in terms of moving them up to coder IIs. It should have happened a year after they got hired." Q: "That was per the program, I guess?" A: "Correct").

[6] Kropp. Dep. Tr. at 29:22-30:11.

[7] *Id.* at 119:20-120:7.

performance reports used by the Coding Manager to evaluate coders.[8] The annual evaluation ranks coders as a "Top Performer," a "Valued Performer," or "Needs Improvement."[9]

During most of Kropp's first year as an in-patient coder, Victor Fabian, the HIM Director and the only other male employee in the HIM Department, served as the acting Coding Manager.[10] In August 2017, Jacqueline Marshall became the interim Coding Manager and assumed full responsibilities as Coding Manager three months later.[11]

Before Marshall became the Coding Manager, Fabian had scored Kropp as a "Valued Performer" in his first coder evaluation in March 2017.[12] Fabian wrote that "Rick is a pleasure to work with. He is appropriately concerned about his work and will go above and beyond to assist the team."[13] Fabian noted that Kropp was "still developing his coding skills."[14]

The following year, in his February 2018 evaluation, Marshall scored Kropp as "Needs Improvement."[15] She noted that he had not met the productivity or quality

---

[8] *See* Def.'s Mot. for Summ. J. Ex. 5 at 19:23-20:17 (Garland-Gibson Deposition Transcript) (ECF No. 37-4).

[9] *See* Def.'s Mot. for Summ. J. Ex. 9 at 20:4-23 (Melchiorre Deposition Transcript) (ECF No. 37-5).

[10] Fabian Dep. Tr. at 16:21-17:12.

[11] *See* Def.'s Mot. for Summ. J. Ex. 4 at 8:15-9:23 (Marshall Deposition Transcript) (ECF No. 37-4); *see also* Fabian Dep. Tr. at 16:21-17:12.

[12] Pl.'s Resp. to Mot. for Summ. J. Ex. J (Kropp 2017 Performance Evaluation) (ECF No. 38-4). This evaluation covered the year 2016, where Kropp served as a DNFB assistant until June. Both positions are discussed in the evaluation.

[13] *Id.* at Cooper 00089-90.

[14] *Id.* at Cooper 00087.

[15] Kropp Dep. Tr. at 98:24-99:9.

3

benchmarks.[16] A "Needs Improvement" score mandated placement on a Performance Improvement Plan (PIP).[17] A failure to successfully complete a PIP can result in termination.[18]

Before the expiration of the PIP, Kropp and the four female coders who started with him were promoted by Fabian to the position of Coder II as part of the coder associate program.[19] Marshall was not involved in that decision.[20]

After Marshall became the Coding Manager, Kropp and some female colleagues expressed dissatisfaction with her management style. In February or March 2018, Jill Melchiorre, a member of Cooper's HR department, held a meeting with the coders to get feedback about Marshall's management style.[21] As part of the meeting, coders wrote anonymous comments on sticky notes about Marshall.[22] The feedback was mostly negative.[23] Kropp wrote that Marshall "discriminates against employees because of their gender."[24] Kropp claims that HR "would know who [made the complaint] when [the HR employee] stuck them up" on the wall during the meeting.[25] He also claims he complained

---

[16] *Id.* at 100:14-101:17.

[17] Melchiorre Dep. Tr. at 20:6-21:13.

[18] *Id.* at 68:3-24.

[19] Fabian Dep. Tr. at 52:3-23.

[20] *Id.* at 121:12-17.

[21] Melchiorre Dep. Tr. at 86:9-88:4.

[22] Kropp Dep. Tr. at 73:19-74:1; 77:12-19.

[23] Melchiorre Dep. Tr. at 89:24-90:7.

[24] Kropp Dep. Tr. at 73:19-74:1; 77:12-19.

[25] *Id.* at 75:22-76:1; 76:20-23.

4

to Marshall during one-on-one meetings, "on one occasion, possibly two," that she treated him differently because he was male.[26]

As with all new Coder II employees, Kropp was subject to a "90-day review period."[27] At the end of those 90 days, Marshall rated Kropp as "Needs Improvement" because he failed to meet his performance goals.[28] Marshall placed Kropp on a second PIP on June 12, 2018.[29] On July 10, citing Kropp's failure to meet the required performance benchmarks during his PIP, Cooper terminated him.[30]

Kropp filed this lawsuit, contending he was fired on the basis of gender discrimination and in retaliation for complaining about it. Cooper asserts he was terminated because of poor performance and for no any other reason.

**Standard of Review**

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion,

---

[26] *Id.* at 130:7-11; 160:3-21.

[27] Fabian Dep. Tr. 52:11-23.

[28] *See* Pl.'s Resp. to Mot. for Summ. J. Ex. AA (Kropp Coder II Performance Review) (ECF No. 38-6).

[29] Kropp Dep. Tr. at 113:8-114:1; *see also* Def.'s Mot. for Summ. J. Ex. 8 (Kropp Audio Transcriptions) (ECF No. 37-4).

[30] *Id.*

5

we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. FED. R. CIV. P. 56(a). Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which it bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## Analysis[31]

A claim of employment discrimination based on disparate treatment may be proven by either direct evidence of discriminatory intent or indirect evidence from which one can infer an intent to discriminate. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008); *Logue v. Int'l Rehab. Assocs.*, 837 F. 2d 150, 153 (3d Cir. 1988) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981)). Kropp does not rely on direct evidence. Instead, he contends the indirect evidence permits an inference of discriminatory intent. Therefore, the familiar three-step *McDonnell Douglas* burden-shifting standard applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *C.A.R.S.,* 527 F.3d at 364.

Kropp must first establish a *prima facie* case. *Id.* at 802. If he fails to establish a *prima facie* case, Cooper is entitled to judgment as a matter of law. If he succeeds in establishing a *prima facie* case, the burden shifts to Cooper to "'articulate a legitimate nondiscriminatory reason for the adverse employment action.'" *Willis v. UPMC Children's Hosp. of Pitt.*, 808 F.3d 638, 644 (3d Cir. 2015) (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999)) (further citations omitted). If Cooper satisfies its burden, Kropp must produce evidence from which a reasonable factfinder could conclude that the proffered reason for taking the adverse action was merely a pretext for intentional discrimination. *Id.* (citing *Burton*, 707 F.3d at 426–27). The final burden of production

---

[31] Kropp asserts claims for discrimination and retaliation under both Title VII and the New Jersey Law Against Discrimination. "The same legal standards govern claims arising under Title VII and the New Jersey Law Against Discrimination (NJLAD), so [we] will analyze Plaintiff's federal and state law claims together." *Ortiz v. Waste Mgmt., Inc.*, No. 21-459, 2021 WL 681977, at *2 (D.N.J. Feb. 22, 2021); *see Goodall-Gaillard v. N.J. Dep't of Corr.*, 625 F. Appx. 123, 128 (3d Cir. 2015) (holding that Title VII and NJLAD claims are analyzed under the same framework) (citing *Craig v. Suburban Cablevision, Inc.*, 660 A.2d 505, 508 (N.J. 1995)).

"merges with the ultimate burden of persuading [the jury] that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

*Disparate Treatment*

Kropp claims that Marshall discriminated against him in the evaluation process because he was a male. He contends she evaluated his female colleagues more favorably even though they failed to meet the same performance standards. In short, Kropp claims that he was not the only coder performing poorly but was the only one punished.

Cooper does not contend Kropp failed to establish a *prima facie* case.[32] It proceeds directly to the second step, arguing that the undisputed facts demonstrate that it had a legitimate, non-discriminatory reason for firing him, shifting the burden to Kropp to produce evidence from which a reasonable factfinder could conclude that Cooper's reason was pretext for intentional discrimination.

In meeting its burden, Cooper need only introduce "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The defendant's burden is one of "production, . . . not of persuasion." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). It can satisfy its burden

---

[32] Cooper argues that, under the NJLAD, Kropp must meet "a heightened standard" and prove Cooper was the "unusual employer who discriminates against the majority" as part of his *prima facie* case. Def.'s Br. in Supp. of Mot. for Summ. J. at 13 (ECF No. 37-1). Because we are granting summary judgment on Kropp's Title VII claim, we need not address the applicability of the heightened NJLAD standard. *See Kirschling v. Atl. City Bd. of Educ.*, 604 F. Appx. 153, 155 n.3 (3d Cir. 2015) (disapproving of the district court's use of "background circumstances" test for NJLAD constructive discharge claim, explaining that laying out the "'prima facie case in terms of 'background circumstances' and the uniqueness of the particular employer is both problematic and unnecessary'") (quoting *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999)).

by "introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763. It "need not prove that the tendered reason actually motivated" its decision. *Id*. It need only show that its decision could have been motivated by the proffered legitimate, non-discriminatory reason. *Id*.; *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).

Cooper has produced evidence of a legitimate, non-discriminatory reason for Kropp's termination. The undisputed facts show that Cooper terminated Kropp because he did not meet the Coder II performance standards and was "unable to perform his job at a level that was acceptable to his managers."[33] Like all new Coder IIs, Kropp was evaluated after his "90-day review period."[34] He was rated as "Needs Improvement" because he failed to meet performance standards.[35] He was given 30 days to improve. He did not.[36] A month later, he was terminated for poor performance.[37]

Cooper having shown a legitimate reason for firing Kropp, the burden shifts to Kropp to discredit the proffered justification or present evidence that he was fired for a discriminatory reason. *Fuentes*, 32 F.3d at 764. It is not enough to show that Cooper was wrong or mistaken in its decision.

To carry his burden, Kropp must proffer evidence which: "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could

---

[33] Def.'s Br. in Supp. of Mot. for Summ. J. at 12.

[34] Fabian Dep. Tr. at 52:11-23.

[35] *See* Kropp Coder II Performance Review.

[36] Kropp Dep. Tr. at 113:8-114:1; Def.'s Mot. for Summ. J. Ex. 16 ("I reviewed a total of 42 cases hoping the Quality/DRG accuracy would improve. Unfortunately, this did not occur").

[37] *See* Kropp Audio Tr. at 38:6-16.

9

reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id*. at 762.

A plaintiff may discredit the proffered reason by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (emphasis removed) (citations and internal quotation marks omitted).

A plaintiff may raise an inference of discrimination by presenting evidence that the defendant treated "similarly situated persons" more favorably. *Wright v. Providence Care Center, LLC,* 822 F. Appx. 85, 92 (3d Cir. 2020) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998)). Cooper does not dispute that Chotalal and White were similarly situated to Kropp. Indeed, Kropp, Chotalal, and White shared the same job, supervisor and decision-makers.

Kropp claims that these two similarly situated female employees were not placed on a PIP and not terminated even though they too failed to meet performance standards. He argues that Cooper's data shows that Marshall's decision to place him on a PIP and terminate him was not based on his performance, but on gender animus. To show how he was disparately treated, Kropp created a chart outlining performance scores for himself, Chotalal, and White.[38]

---

[38] *See* Pl.'s Stmt. of Disputed and Material Facts at ¶ 80 (PSDMF) (ECF No. 38-1).

A coder's performance is measured by productivity and quality. Productivity is measured by the number of charts reviewed per hour.[39] Quality is measured by a coder's accuracy across two types of codes: Diagnostic Related Group ("DRG") and secondary codes.[40]

Kropp's chart appears to support his claim that Chotalal and White performed much the same as he did. But, it is incomplete. It includes productivity and only one of the two accuracy components, DRG accuracy. It does not include the coding accuracy component. This omission is significant because Kropp's coding accuracy was well below both the standard and his cohorts'.

At his 90-day Coder II probationary review meeting on June 12, Marshall and Kropp discussed his inadequate coding accuracy. Kropp acknowledged it was deficient. The following excerpt from the meeting with Marshall that Kropp surreptitiously recorded shows that his coding accuracy did not reach the minimum benchmark and he knew it:

> Marshall: Coding quality, your coding – DRG's, let me start with DRG's. For March was 85 percent. April was 83 percent. May was 100 percent. DRG accuracy for an average of 89 percent. You need to get up to the 90s. Overall in average in terms of where you would be. So those two months of March and April really hurt you. **Your problem is your coding accuracy.** March your coding accuracy was 71 percent. Went up in April to 83 percent. Back down in May to 76 percent. So this is all your secondary codes that you're getting dinged on, and for some reason I'm not sure what it is. **You're in the 70s. And you need to be in the 90s...** You have an overall average for those three months of 76 percent which is –
>
> Kropp: Not good.[41]

---

[39] *See* Marshall Dep. Tr. at 16:23-17:15.

[40] *Id*. at 18:23-19:17. DRG codes directly affect Cooper's bill to the insurance company and secondary codes denote the proper diagnoses, background conditions, and procedures reflected on the chart. *Id*. at 19:12-24.

[41] Kropp Audio Tr. at 18:22-19:20 (emphasis added).

11

Pointing to his DRG and coding accuracy scores for March, April, and May,[42] Marshall told Kropp that his "DRG [accuracy] was fine for [her]. But the *coding accuracy is way off*."[43] At the end of the meeting, she told Kropp that "if you can maintain in the next 30 days, maintain your DRG accuracy, that is a plus. You need to get your quality coding, quality coding accuracy . . . secondary procedures, you need to get that up."[44]

In his Coder II performance review, Marshall wrote that Kropp "improve[d] his DRG accuracy but *overall coding accuracy* needs improvement."[45] Specifically, she noted that his "[o]verall coding quality for the review period is 76% and DRG is 89%[.] [T]his needs to be improved on *since 76% coding accuracy is unacceptable*."[46] Marshall rated Kropp as "Needs Improvement" and assigned him a 30-day PIP with the task of improving his "coding quality."[47]

At a follow-up meeting on June 29, Marshall again advised Kropp his "biggest problem seems to be [his] secondary diagnosis."[48] His June coding accuracy was 77 percent.[49] She expressed concern that his "secondary codes are not going up" and remained "in the 70s. . . ."[50] Marshall wrote in Kropp's PIP that "his continued lack of

---

[42] *Id.* at 18:22-19:4.

[43] *Id.* at 20:14-18 (emphasis added).

[44] *Id.* at 24:5-9.

[45] Kropp's Coder II Performance Review at Cooper 00108 (emphasis added).

[46] *Id.* at Cooper 00106 (emphasis added).

[47] Pl.'s Resp. to Mot. for Summ. J. Ex. DD at Cooper 00002 (Kropp's June 2018 PIP).

[48] Kropp Audio Tr. at 32:11-12.

[49] *Id.* at 32:11-19.

[50] *Id.* at 33:1-14.

12

capturing correct PD & secondary diagnoses is a major issue. . . ."[51] Over the following weeks, Kropp did not improve.[52] His failure to improve his coding accuracy, a failure he acknowledged,[53] was the basis for his termination on July 10.[54]

The following chart presents a complete comparative evaluation of the performance of the three similarly situated employees.[55] It includes the coding accuracy measurement. It demonstrates that Kropp's performance was significantly lower than his cohorts'.

|  | Kropp | | | White | | | Chotalal | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Date | DRG % | Coding | Product. | DRG % | Coding | Product. | DRG % | Coding | Product. |
| 1/18 | 71% | 79% | 1.33 | 92% | 95% | 1.03 | 84% | 84% | 1.61 |
| 2/18 | 85% | 75% | 1.19 | 85% | 94% | 1.13 | 83% | 96% | 1.40 |
| 3/18 | 85% | 71% | 1.24 | n/a | n/a | 1.62 | 95% | 99% | 1.51 |
| 4/18 | 83% | 83% | 1.37 | 96% | 85% | 1.63 | n/a | n/a | 1.91 |
| 5/18 | 100% | 76% | 1.68 | 100% | 99% | 1.59 | 90% | 97% | 2.00 |
| 6/18 | 84% | 77% | 1.63 | 100% | 98% | 1.69 | 90% | 97% | 2.01 |
| 90-day avg. | 89% | 76.7% | 1.43 | 98% | 92% | 1.61 | 93% | 98% | 1.81 |

As the objective data shows, not only was Kropp's coding accuracy below both the

---

[51] Pl.'s Resp. to Mot. for Summ. J. Exh. DD at Cooper 00002 (Kropp's June 2018 PIP). Marshall separately noted that Kropp's "DRG also dropped." Id.

[52] Id.

[53] At their June 29 meeting, Kropp promised Marshall that he would "concentrate on the secondary" codes until his 30-day PIP ended. See Kropp Audio Tr. at 34:6. But moments later he recorded himself complaining to a coworker that "[t]hey're looking at so much detail. Secondary code, secondary code. I can't wait for two more weeks to get done. I want to leave now but I can't." Id. at 37:9-13.

[54] Id. at 38:12-17.

[55] This chart was constructed from the chart contained in Kropp's statement of undisputed facts. PSDMF ¶ 80. Coding accuracy data was pulled from Kropp, White, and Chotalal's 2018 monthly audits. See Pl.'s Resp. to Mot. for Summ. J. Exhs. S, T, and U (2018 Audit Reports) (ECF No. 38-5). Kropp's March 2018 coding accuracy percentage was provided by Marshall at his 90-day review meeting. See Kropp Audio Tr. at 18:22-19:20.

HIM Department's 95% performance goal and Marshall's expectation of it being "in the 90s," it was, on average, 15 to 20 percent less accurate than his comparators.[56] After 90 days as Coder IIs, both Chotalal and White's coding accuracy averages were in the 90s and, in the final month of their probationary period, exceeded 95 percent coding accuracy.

The complete comparison chart supports Cooper's contention that it had a legitimate, nondiscriminatory reason for placing Kropp on a PIP and later terminating him when he failed to improve his accuracy. A review of the objective evidence shows that White and Chotalal met expectations during the Coder II 90-day probationary evaluation period and Kropp did not. Both Chotalal and White's coding accuracy and DRG accuracy were "in the 90s." Kropp was 15 to 20 percent less accurate than his colleagues and well below the standard of "in the 90s." After a month on the PIP, his DRG accuracy decreased and his coding accuracy remained below acceptable standards.

Kropp admits that he did not meet the coding accuracy goal. The objective data shows that his comparators did.

Kropp failed to carry his burden to present evidence that either casts doubt on Cooper's legitimate reason for terminating him or proves that "discrimination was more likely than not a motivating or determinative cause . . . ." *Fuentes*, 32 F.3d at 762. There is no evidence to rebut, directly or indirectly, that the objective coding accuracy data showing his poor performance was what motivated Cooper's decision to terminate him.

---

[56] Kropp argues that he and the other coders had to maintain a 95% accuracy score to avoid being placed on a PIP. PSDMF ¶¶ 32-34; *see* Marshall Dep. Tr. at 78:17-20 (Q: "So it looks like at least as of February 23rd of 2018, Richard was held to a 95 percent or higher coding quality; is that correct?" A: "Yes."). However, both Marshall and Fabian gave leeway to coders scoring "in the 90s." *See* Fabian Dep. Tr. at 105:24-106:17 (Q: "Is there any type of leeway, say, from 90 to 95?" A: "Again, yes." Q: "Would you say under 90 at least would probably not be enough leeway? Meaning, if you're scoring 89, 88, that's still under standards, and you probably wouldn't give leeway for that, correct?" A: "Correct").

Therefore, because Kropp has not produced any evidence to cast doubt on Cooper's legitimate, non-discriminatory reason for his firing or suggest its decision was motivated by discriminatory animus, Cooper is entitled to summary judgment on the gender discrimination claim.

*Retaliation*

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) his employer took adverse employment action against him after or contemporaneously with his protected activity; and (3) there was a causal connection between his protected activity and the adverse employment action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015); *Moore v. City of Phila.,* 461 F.3d 331, 340–41 (3d Cir. 2006). If the plaintiff establishes his *prima facie* case, the *McDonnell Douglas* framework applies. *Moore*, 461 F.3d at 342. The defendant must present a legitimate, non-retaliatory reason for its action and, if it does, "'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).

Kropp identifies three instances he contends were protected activity: (1) his December 2017, January 2018, or February 2018 complaints to Marshall that she was "singling [him] out because [he] was a guy;"[57] (2) his anonymous sticky note complaint made during Marshall's managerial assimilation meeting in February or March 2018 about

---

[57] Kropp Dep. Tr. at 143:11-21; 88:22-89:21; 95:6-19.

how Marshall discriminates based on gender;[58] and (3) "on one occasion, possibly two" occasions when he complained to Marshall during monthly one-on-one meetings about how her actions towards him were based on his gender.[59] Despite the informality of these statements, they are protected because they express concerns of discriminatory treatment. *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (quoting *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990)) (holding that protected activity includes both formal and informal charges as well as protests of discriminatory employment practices).

Cooper claims Kropp cannot establish a causal connection between his complaints of gender discrimination and his termination and that he has no evidence of pretext. A plaintiff may establish a causal connection through the "unusually suggestive temporal proximity" of the adverse action to the protected activity, "a pattern of antagonism coupled with timing," or other facts supporting an inference of causation. *Budhun v. Reading Hosp. and Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014); *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) ("These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference").

Here, Kropp claims that after he complained to Marshall about her discriminating against him, she continued to single him out. Specifically, he references her statement

---

[58] *Id.* at 74:14-23; 75:1-7.

[59] *Id.* at 134:8-14 (Q: "So these one or two occasions where you told Ms. Marshall that, words to the effect of because I'm a guy, that occurred before the HR meeting?" . . . . A: "I believe so."); 130:7-11 ("I told her, I can't remember which meeting, we had many one-on-ones, and I told her, it seems to me like you are doing this because I'm a guy. And I had said that to her on one occasion, possibly two").

16

in a coder meeting, "let's hear from the man,"[60] and her June 2018 email to him and the female coders where she addressed them all as "Ladies,"[61] as evidence establishing a causal connection between his complaints in January, February, and March 2018 and his termination in June 2018.

Assuming Kropp established a *prima facie* case, his retaliation claim fails for the same reason his discrimination claim does. The undisputed evidence shows that he was fired because of objectively poor performance. As previously discussed, Cooper had a legitimate reason for terminating Kropp – his poor coding accuracy. Cooper having articulated a legitimate justification for his termination, the burden shifted to Kropp to discredit Cooper's stated reason for terminating him and to establish that the real reason was retaliation. *Moore,* 461 F.3d at 342 (citing *Krouse*, 126 F.3d at 500–01). As with his discrimination claim, Kropp has failed to do so.

Kropp does not contend that his accuracy scores are incorrect or fabricated. The only individual that Kropp claims retaliated against him, Marshall, had no part in creating the data that led to his termination. The objective data was compiled by CQSs who do not evaluate coders. After reviewing the data, she presented it and recommended termination to Fabian who made the decision to terminate Kropp after reviewing the data himself.[62] There is no evidence that Fabian was aware of any complaint made by Kropp. Kropp has not proffered any evidence that tends to cast doubt on Cooper's stated legitimate business reason for terminating him or that it was pretext for retaliation.

---

[60] *Id*. at 77:24-78:17; 125:18-23.

[61] *See* Pl.'s Resp. to Mot. for Summ. J. Ex. Z (ECF No. 38-5).

[62] Fabian Dep. Tr. at 64:14-16.

**Conclusion**

The undisputed facts show that Cooper's decision to terminate Kropp after his 90-day probationary review period and subsequent 30-day PIP was not motivated by a discriminatory animus but based on his poor job performance. These facts also show that Cooper's decision was not in retaliation for any of his comments to Marshall about his gender. Therefore, we shall grant Cooper's motion for summary judgment.